104 F.Supp.2d 1280 (2000)
Wendy FAUSTIN, Plaintiff,
v.
CITY AND COUNTY OF DENVER, COLORADO; Tom Sanchez, in his official capacity as Chief of the Denver Police Department; Lt. Donald Fink, in his official capacity as an officer of the Denver Police Department; and Sgt. W.P. Honer, in his official capacity as an officer of the Denver Police Department, Defendants.
No. Civ.A. 98 N 2554.
United States District Court, D. Colorado.
March 31, 2000.
*1281 Stephen M. Crampton, Michael J. DePrimo, Brian Fahling, Bryan J. Brown, American Family Association Law Center, Tupelo, MS, for plaintiff.
Stanley M. Sharoff, Geoffrey S. Wasson, City Attorney's Office, Denver, CO, for defendants.

ORDER AND MEMORANDUM OF DECISION
NOTTINGHAM, District Judge.
This is civil-rights action. Plaintiff Wendy Faustin alleges that Defendants City and County of Denver, Colorado ("Denver"), Denver Chief of Police Tom Sanchez, Denver Police Lieutenant Donald Fink, and Denver Police Sergeant W.P. Honer have curtailed her protesting activities in violation of her rights under the First and Fourteenth Amendments to the United States Constitution. Faustin seeks declaratory and injunctive relief, as well as nominal damages and attorney fees, under 42 U.S.C.A. § 1983 (West 1994 & Supp. 1999) [hereinafter "section 1983"]. The matter is before the court on: (1) "Plaintiff's Motion for Summary Judgment" filed March 22, 1999; and (2) "Defendants' Motion for Summary Judgment" filed April 8, 1999. Jurisdiction is based on 28 U.S.C.A. §§ 1331, 1343(a)(3)-(4) (West 1993), and 28 U.S.C.A. §§ 2201-02 (West 1994).

FACTS
Because of her religious and/or ethical convictions, Faustin regularly protests abortion throughout Denver in public fora where she can convey her message to significant numbers of passersby. (Pl.'s Br. in Supp. of Mot. for Summ.J., Statement of Undisputed Material Facts ¶ 6; [filed Mar. 22, 1999] [hereinafter "Pl.'s Br."]; admitted at Defs.' Resp.Br. in Opp'n to Pl.'s Mot. for Summ.J., Resp. to Statement of Undisputed Material Facts ¶ 6 [filed Apr. 8, 1999] [hereinafter "Defs.' Resp."].) On numerous occasions, Faustin has traveled to an overpass located in Denver at the juncture of Sixth Avenue and Perry Street ("Perry Street Overpass"), where she and others have located themselves on the sidewalk of the overpass and displayed a banner with the message, "Abortion kills children." (Id., Statement of Undisputed Material Facts ¶ 7; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 7.) The banner is approximately three feet high and ten feet wide when unfurled. (Defs.' Mem.Br. in Supp. of Their Mot. for Summ.J., Statement of Undisputed Material Facts ¶ 2 [filed Apr. 8, 1999] [hereinafter "Defs.' Br."]; admitted at Pl.'s Br. in Opp'n to Defs.' Cross Mot. for Summ.J., and Reply to Defs.' Br. in Opp'n to Pl.'s Mot. for Summ.J., Resp. to Statement of Undisputed Material Facts ¶ 2 [filed Apr. 26, 1999] [hereinafter "Pl.'s Resp."].) Denver maintains and operates *1282 the Denver Police Department, whose officers have, in the past, applied a Denver ordinance against posting signs, Denver, Colo., Mun.Code art. I, ¶ 3-1 (1950) [hereinafter "Posting Ordinance"], against Faustin's protest activities on the Perry Street Overpass. (Pl.'s Br., Statement of Undisputed Material Facts ¶ 1; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 1.)[1] Further, the Colorado Department of Transportation prohibits the display of all sips and banners on overpass sidewalks and walkways throughout the Denver metropolitan area, regardless of the content of those signs and banners. (Defs.' Br., Statement of Undisputed Material Facts ¶ 9; admitted at Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 9.) Plaintiff has engaged in speech, including picketing or carrying signs, without interference or hindrance from Denver police or other city officials officers at any location except the Perry Street Overpass. (Id., Statement of Undisputed Material Facts ¶ 10; admitted in pertinent part at Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 10.)
The sidewalk on the Perry Street Overpass is public property, intended to be used for pedestrian traffic to cross over the highway. (Pl.'s Br., Statement of Undisputed Material Facts ¶¶ 9-10; admitted in pertinent part at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 9-10.) The sidewalk along the overpass is located between the roadway and a six-foot-high chain-link fence. (Id., Statement of Undisputed Material Facts ¶ 12; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 12.) Every time police observed Faustin displaying her banner, the banner was hand-held rather than affixed to any inanimate object. (Id., Statement of Undisputed Material Facts ¶ 13; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 13.) When the banner is displayed, a large number of passing motorists driving beneath the Perry Street Overpass and along Sixth Avenue are able to view the banner. (Id., Statement of Undisputed Material Facts ¶ 11; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 11.)
On December 5, 1997, Faustin and others were standing on the sidewalk at the Perry Street Overpass, displaying their hand-held banner to passersby when Denver Police Officer L.M. Lindsay approached them. (Id., Statement of Undisputed Material Facts ¶ 14; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 14.) Officer Lindsay asked Faustin to put down the banner or otherwise stop displaying it from the Perry Street Overpass sidewalk. (Id., Statement of Undisputed Material Facts ¶ 15; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.) Faustin complied with Officer Lindsay's request, and then asked him to cite the specific law which she was allegedly violating. (Id., Statement of Undisputed Material Facts ¶ 16; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 16.) A short time later, Denver Police Sergeant Larry Subia arrived. (Id., Statement of Undisputed Material Facts ¶ 17; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 17.) Both officers then reviewed a traffic manual but could find no law proscribing Faustin's display of the banner on the Perry Street Overpass. (Id., Statement of Undisputed Material Facts ¶ 18; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 18.) After a third officer arrived and a total of one hour passed, the officers informed Faustin that they were *1283 unaware of any law which she may have violated by displaying her banner. (Id., Statement of Undisputed Material Facts ¶ 18; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 18.)
On February 6, 1998, Faustin and others had been displaying their banner at the Perry Street Overpass for nearly an hour when Denver Police Sergeant Reyes approached Faustin. (Id., Statement of Undisputed Material Facts ¶ 19; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 19.) Sergeant Reyes informed Faustin that she could not display the banner at the overpass, but, when Faustin advised him that she was finished displaying her banner for the day, Sergeant Reyes did not pursue the matter further. (Id., Statement of Undisputed Material Facts ¶ 20; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 20.)
On March 6, 1998, plaintiff and others again went to the Perry Street Overpass to display the banner. (Id., Statement of Undisputed Material Facts ¶ 21; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 21.) Soon after they arrived, Denver Police Officer John Blea approached them. (Id., Statement of Undisputed Material Facts ¶ 22; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 22.) Officer Blea told Faustin that she could not display her banner on the overpass because to do so was a violation of the Posting Ordinance. (Id., Statement of Undisputed Material Facts ¶ 23; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 23.) From his police cruiser, Officer Blea called Lieutenant Fink, who advised Faustin that he display of the banner could be in violation of Colo.Rev.Stat. §§ 43-1-401 to 43-1-408 (1999) [hereinafter "Outdoor Advertising Act"].[2] (Id., Statement of Undisputed Material Facts 25; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 25.)
On March 27, 1998, Faustin's counsel sent a letter to then-Denver Police Chief David L. Michaud, requesting assurances from Chief Michaud that Faustin and others would not be arrested for displaying the banner on the sidewalk overpass. (Id., Statement of Undisputed Material Facts ¶ 26; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 26.) Faustin's counsel received no response from Chief Michaud or any other city official regarding the March 27, 1998, letter.
On August 7, 1998, after a four-month hiatus, Faustin returned to the Perry Street overpass and displayed the banner. (Id., Statement of Undisputed Material Facts ¶ 28; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 28.) Denver Police Sergeant W.P. Honer arrived shortly thereafter and cited Faustin for violating the Posting Ordinance ("posting charge"). (Id., Statement of Undisputed Material Facts ¶ 29; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 29.) On October 9, 1998, the posting charge against Faustin was formally dismissed in open court. (Id., Statement of Undisputed Material Facts ¶ 30; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 30.) Denver City Prosecutor Vincent DiCroce had determined that Faustin was merely holding the banner, that the banner had not been affixed in any way, and that the Posting Ordinance was therefore not applicable to Faustin's conduct. (Id., Statement of Undisputed Material Facts ¶ 31; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 31.)
On October 27, 1998, Faustin's counsel faxed a letter to Chief Sanchez, who had been recently appointed. (Id., Statement *1284 of Undisputed Material Facts ¶ 32; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 32.) The letter requested written assurance that Faustin would not again be subject to citation and/or arrest for the peaceful exercise of her constitutional rights. (Id., Statement of Undisputed Material Facts ¶ 32; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 32.) Neither Chief Sanchez nor any other city official responded to the October 27, 1998, letter, however. (Id., Statement of Undisputed Material Facts ¶ 33; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 33.) Indeed, it is Denver's policy to give no assurances that citations or arrests will not be made in the future. (Id., Statement of Undisputed Material Facts ¶ 47; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 47.)
On November 18, 1998, Assistant City Attorney Jim Thomas issued a memorandum to Chief Sanchez ("Thomas memorandum"), advising Chief Sanchez that Faustin's conduct was "protected free speech activity" and that Faustin's "protected behavior may continue until or unless there is an actual public safety hazard presented by its impact on the operators of the motor vehicles present. This does not mean an anticipated or potential public safety hazard, but a real, present hazard." (Id., Ex. B [Mem. from Thomas to Sanchez of 11/18/98].) The Thomas memorandum was not disclosed to Faustin until it was submitted as an exhibit to one of defendants' reply briefs in this litigation on January 18, 1999. (Id., Statement of Undisputed Material Facts ¶ 42; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 42.)
Faustin regularly engages in abortion protest in a variety of locations in the Denver area. (Id., Statement of Undisputed Material Facts ¶ 44; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 44.) She refrained from displaying her banner on the Perry Street Overpass between August 1998, and January 1999, however, out of fear that she would be subject to citation and/or arrest, detention, and punishment for violating the Posting Ordinance. (Id., Statement of Undisputed Material Facts ¶ 45; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 45.) Only after January 21, 1999, when Faustin became aware of the Thomas memorandum, did she return to protest on the Perry Street Overpass. (Id., Statement of Undisputed Material Facts ¶ 46; admitted at Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 46.)
On November 23, 1998, Faustin filed a complaint in this court, alleging that defendants deprived of her of her constitutional rights to free speech, free exercise of religion, and right to free assembly, in violation of section 1983. (Verified Compl. for Civil Rights Violations and for Injunctive and Declaratory Relief and Damages [filed Nov. 23, 1998] [hereinafter "Compl."].) Faustin seeks, inter alia, a declaratory judgment that the application of the Posting Ordinance to her display of the banner was unconstitutional. She further seeks an injunction to prevent defendants from future application of the Posting Ordinance to her activities and nominal damages for the violation of her rights. On March 22, 1999, Faustin filed a motion for summary judgment on all her claims. On April 8, 1999, defendants filed a cross motion for summary judgment. (Defs.' Mot. for Summ.J. [filed Apr. 8, 1999].)[3]

ANALYSIS

1. Legal Standard
Under rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and *1285 admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); Concrete Works, Inc. v. City & County of Denver, 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." Concrete Works, Inc., 36 F.3d at 1518 (citing Celotex Corp., 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324, 106 S.Ct. at 2553; see Fed.R.Civ.P. 56(e). The court may consider only admissible evidence when ruling on a summary judgment motion. See World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir.1985). The factual record must be viewed in the light most favorable to the nonmoving party. Concrete Works, Inc., 36 F.3d at 1518 (citing Applied Genetics Int'l. Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990)).

2. First Amendment Analysis

a. Nature of Forum
First Amendment doctrine addresses restraints on speech, in part, according to the nature of the selected forum. Essentially, fora are divided into three categories: (1) traditional public forum; (2) designated public forum; and (3) non-public forum. The more public a forum, the fewer the permissible restrictions on speech which occurs there. The Supreme Court has detailed each of these fora:
In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communication thoughts between citizens, and discussing public questions.... A second category consists of public property which the state has opened for use by the public as a place for expressive activity.... Public property which is not by tradition or designation a forum for public communication is governed by different standards.
Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983) (citations and footnotes omitted). In this case, the parties dispute whether or not the Perry Street Overpass may be considered a traditional public forum and, as such, whether any regulations of speech thereon are subject to the highest level of scrutiny.
Sidewalks are considered "quintessential" public fora. Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). "Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property." United States v. Grace, 461 U.S. 171, 179, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983). As defendants stress, however, not every sidewalk is invariably a public forum. To support this assertion, defendants cite United States v. Kokinda, 497 U.S. 720, 728-29, 110 S.Ct. 3115, 3120, 111 L.Ed.2d 571 (1990), Chicago Acorn v. Metropolitan Pier and Exposition Authority, 150 F.3d 695 (7th Cir.1998), and Jacobsen v. Bonine, 123 F.3d 1272 (9th Cir.1997), in which the deciding courts found that particular walkways *1286 or sidewalks did not rise to the level of traditional public fora. Indeed, "[t]he mere physical characteristics of the property cannot dictate forum analysis." Kokinda, 497 U.S. at 727, 110 S.Ct. at 3120. In each of these cases, the deciding court found that "the location and purpose of a publicly owned sidewalk is crucial to determining whether such a sidewalk constitutes a public forum." Id. at 728-29, 110 S.Ct. at 3121. Thus, in Kokinda, the Supreme Court compared a "municipal sidewalk that runs parallel to the road" which was a "public passageway" to a sidewalk which "was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city," and found that only the former was a traditional public forum. Id. at 727, 728, 110 S.Ct. at 3120. Similarly, in Chicago Acorn, the Seventh Circuit rejected the notion that sidewalks leading "only to the pier facilities" could be traditional public fora with the following justification:
The sidewalks are not through routes.... Rather than being part of the city's automotive, pedestrian, or bicyclists' transportation grid, the sidewalks on the pier and the service street on its north side are internal to the pier, like the sidewalks, streets, and parking lots in Disney World or McCormick Place.
Chicago Acorn, 150 F.3d at 702. Finally, in Jacobsen, the Ninth Circuit held that sidewalks bordering the parking area and facilities of a public rest area located adjacent to an interstate highway could not be considered public fora because:
These perimeter walkways ... are not traditional sidewalks, accessible to and from general pedestrian traffic. They are accessible only by persons traveling in motor vehicles on interstate highways.... Like the ingress/egress walkways involved in Kokinda, the walkways at issue here do not have the characteristics of public sidewalks traditionally open to expressive activity. These walkways are integral parts of the rest stop areas, which are themselves oases from motor traffic.
Jacobsen, 123 F.3d at 1273-74.
The facts of the case at bar are easily distinguished from these three cases and their ilk. It is undisputed that the purpose of the sidewalk on the Perry Street Overpass is for pedestrian traffic to cross over the highway, even if, as defendants' expert asserts, the sidewalk was not designed for pedestrians to stop and congregate for the purpose of expressing their views. (Defs.' Br., Ex. C [Gonzales Aff. ¶ 5].) Unlike the non-public fora sidewalks discussed in the above cases, the sidewalks in this case are not merely for ingress and egress to a particular enclosed facility such as a post office, pier, or highway rest area. Rather, the Perry Street Overpass sidewalks are "part of the city's automotive, pedestrian, or bicyclists' transportation grid." Chicago Acorn, 150 F.3d at 702. Accordingly, I find no reason to diverge from the general rule that sidewalks are traditional public fora.
The standard of review for regulations imposed on speech in areas of traditional public fora is one of strict or intermediate scrutiny, depending upon whether the regulation is content-based or content-neutral. To regulate the speech in such a forum:
the [G]overnment must show that a content-based restriction is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." ... On the other hand, [the court] may uphold content-neutral time, place, and manner restrictions on speech provided they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."
Hawkins v. City & County of Denver, 170 F.3d 1281, 1286 (10th Cir.1999) (quoting Perry, 460 U.S. at 45, 103 S.Ct. at 948).
It appears that there are two statutes which Faustin challenges in this case, and neither is alleged to be a content-based *1287 restriction. Originally, Faustin filed her lawsuit against defendants on the basis of their application of the Posting Ordinance to her protest activities on the Perry Street Overpass. In their motion for summary judgment and responsive briefs, however, defendants now suggest that the statute which Faustin has been and would be violating by holding her banner on the Perry Street Overpass is Colo.Rev.Stat. § 42-4-606(1) (1999) [hereinafter "Unauthorized Display Statute"], which provides, in pertinent part, that "[n]o person shall place, maintain, or display upon or in view of any highway any unauthorized sign, signal, marking, or device which ... hides from view or interferes with the effectiveness of any official traffic control device...." Id. While no agent of the police or city official has knowingly sought to apply the Unauthorized Display Statute to Faustin's conduct thus far, defendants state that the contacts which Faustin had with Denver police officers who requested that she relocate her expressive activities (not including the posting charge incident):
were justified because she was in violation of [the Unauthorized Display Statute]. The fact that the officers did not know the appropriate statutory charge which prohibited [Faustin's] activities is regrettable but, it is respectfully submitted, irrelevant. The unassailable fact is that [Faustin] was (and is) in violation of state law when displaying her banner at the [Sixth] Avenue and Perry Street Overpass.
In any event, it is undisputed that the Colorado Department of Transportation prohibits the display of all signs and banners on overpass sidewalks and walkways throughout the Denver metropolitan area, regardless of the content of those signs and banners. Indeed, according to defendants, "[i]t has been the uniform and consistent policy and practice of the Denver Police Department to prohibit all speech or expressive activities on all highway overpasses located in the City and County of Denver." (Defs.' Br. at 9 [quoting Defs.' Br., Ex. F (Fink Aff. ¶ 3)].) Because it appears that the Posting Ordinance and the Unauthorized Display Statute (as well as the "uniform and consistent policy and practice" based thereon) were and may continue to be applied to Faustin's protesting activities, I consider the constitutionality of each in turn.[4]

b. The Posting Ordinance
Although Faustin attacks the application of the Posting Ordinance to her activities as unconstitutional, she never directly addresses the constitutionality of the Posting Ordinance itself under the intermediate scrutiny standard. A statute or ordinance is overbroad when it includes within its prohibitions activities that are constitutionally protected. Connection Distrib. Co. v. Reno, 154 F.3d 281, 292 (6th Cir.1998) (citing Grayned v. City of Rockford, 408 U.S. 104, 114, 92 S.Ct. 2294 [1972]). Perusal of the ordinance, however, indicates that it is not a blanket prohibition on speech but is, rather, a permissible "time, place, or manner" restriction on printed speech. That is, the ordinance balances the individual right to speech against individual and public property rights and then mandates a "manner" restriction. Notice-posters must obtain permission from the manager of public works or a private property owner before physically attaching any notice to property controlled by another. Accordingly, I find that the Posting Ordinance is constitutional as written.
In this case, defendants concede that Faustin was "mischarged" when she *1288 was served with the posting charge. Indeed, the terms of the statute punish only physical attachment of notices to other property and, in this case, Faustin was holding the banner manually. Thus, even to the extent that the Posting Ordinance is narrowly tailored to serve some arguably significant government interest in either protected physical property or controlling municipal aesthetics, it was applied overbroadly in Faustin's case. The display of a handheld sign does not appear to violate the ordinance on its face, but defendants appear to have applied the Posting Ordinance to Faustin as if this were the ordinance's contents. In this respect, the case is similar to cases where criminal statutes are inappropriately applied to conduct which, in and of itself, merits first amendment protection. In Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), for instance, the Court did not strike down a "breach of the peace" statute in toto as unconstitutionally overbroad on its face since the statute was capable of some constitutional applications. The Court did, however, overturn the conviction of a Jehovah's Witness under the statute because it found that plaintiff Jesse Cantwell's conduct in playing an anti-Catholic Church recording, "considered in the light of the constitutional guarantees, raised no such ... clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question." Id. at 311, 60 S.Ct. 900. Inasmuch as defendants ordered Faustin to stop displaying her sign and charged her pursuant to the Posting Ordinance, they applied the statute in an overbroad and unconstitutional manner in violation of section 1983. Defendants' assertions that Denver "rectified its error by immediately dismissing the citation" issued against Faustin notwithstanding, the fact that Faustin removed the banner after her encounter with Officer Blea, that Faustin was charged at all under the Posting Ordinance, and that Faustin's protesting activities on the Perry Street Overpass were chilled for a four-month period indicate that defendants' constitutional violation was not such a quickly disposed of inconvenience. Because I find that Faustin's constitutional rights were violated by defendants' application of the Posting Ordinance, Faustin's motion for summary judgment is granted and defendants' motion for summary judgment is denied.

c. Unauthorized Display Statute
As noted above, defendants' briefs seek to minimize the role of the Posting Ordinance in this drama in lieu of the Unauthorized Display Statute and defendants' longstanding policy of prohibiting all speech and expressive activity on highway overpasses. Because defendants allege that this is the statute which they enforced against Faustin, I consider it in light of the intermediate scrutiny standard appropriate to a public forum. "A complete ban [on expressive activity] can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil". Frisby, 487 U.S. at 485, 108 S.Ct. at 2503; cf. Perry, 460 U.S. at 45, 103 S.Ct. at 954-55 (in traditional public forum, "the government may not prohibit all communicative activity"). In this case, defendants argue that the "significant government interest" at work is the safety of motorists traveling on the Sixth Avenue freeway. (Defs.' Br. at 10-11.) According to defendants' expert, Gary G. Gonzales of the Colorado Department of Transportation, "the holding of banners or signs on the walkway at the Perry Street Overpass interferes with the effectiveness of the official traffic control devices located at [that] site" because such signs would divert motorists' attention away from "the driving task and from the signage they should be focusing on." (Id., Ex. C [Gonzales Aff. ¶¶ 11, 13].) Faustin counters that (1) common sense dictates that a sign such as Faustin's is no more distracting than any billboard, especially compared to those signs which are located to the side of the highway, rather than directly overhead, and (2) defendants have offered no concrete evidence that Faustin's sign or *1289 signs of a similar type actually cause any interference. (Pl.'s Br. at 11-12, 16.)
Although the question of whether Faustin's sign actually "interferes with the effectiveness of any official traffic control device," thus appears to be subject to a disputed question of fact, I do not need to resolve this issue for purposes of this order. Rather, I base my decision on the undisputed evidence that defendants' application of this statute in general  not just with regard to Faustin  is unconstitutional. "[I]mprecise laws can be attacked on their face under two different doctrines. First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of [f]irst [a]mendment rights if the impermissible applications of the law are substantial when `judged in relation to the statute's plainly legitimate sweep.'" City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 1857, 144 L.Ed.2d 67 (1999) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 612-615, 93 S.Ct. 2908 [1973]). In addition, "even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests". Id. (citing Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855 [1983]). In this case, I find that the Unauthorized Display Statute is both overbroad and vague. To begin with, defendants' blanket prohibition on all expressive activities on any overpass makes the Unauthorized Display Statute impermissibly overbroad.[5] The simple examples which Faustin posits demonstrate the inappropriate scope of this statute. Plainly, a single individual distributing literature to other pedestrians on the overpass sidewalks or holding a small sign towards vehicular traffic crossing the overpass could not be said to distract drivers on the highway below any more than individuals using the sidewalks to cross over Sixth Avenue would distract the motorists below, yet such conduct would be unconstitutional under defendants' application of the Unauthorized Display Statute. In Morales, the Supreme Court rejected the argument that the gang loitering statute at issue could be considered overbroad because, while it arguably intruded on other liberties, including the "freedom to loiter for innocent purposes," the statute did not "have a sufficiently substantial impact on conduct protected by the first amendment to render it unconstitutional." Id. Here, in contrast to Morales, the statute specifically targets signage, and, as it is enforced, targets expressive conduct of any kind. Such a widesweeping policy, particularly as applied to a traditional public fora such as the sidewalk on the Perry Street Overpass, eviscerates the public discourse which first-amendment law is designed to *1290 protect. "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 129, 112 S.Ct. 2395, 2400-01, 120 L.Ed.2d 101 (1992) (citations omitted). Thus, without even ruling on whether the application of the Unauthorized Display Statute to Faustin's activities in particular was or would be constitutional, I find that the statute is facially void for overbreadth.
Alternatively, I consider the Unauthorized Display Statute under the standard established for vagueness. Again, in considering the validity of the statute, I analyze it with reference to the authoritative constructions of the Unauthorized Display Statute, including defendants' own implementation and interpretation of it. "In evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered." Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494, n. 5, 102 S.Ct. 1186, 1191, n. 5, 71 L.Ed.2d 362 (1982); see also Ward v. Rock Against Racism, 491 U.S. 781, 795-96, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 (1989) (quoting same). In this case, I have found no state-law construction of the statute, but the fact that Denver and several of its ranking police officers have defiantly argued that its meaning prohibits all forms of expression in the midst of what I have found to be a public forum is itself dispositive evidence that the statute is apparently not "sufficiently clear so as not to cause persons `of common Intelligence ... necessarily [to] guess at its meaning and [to] differ as to its application[.]'" U.S. v. Wunsch, 84 F.3d 1110, 1110, 1119 (9th Cir.1996) (quoting Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127 [1926]). The intent to avoid such vagaries of administration gives the vagueness doctrine its teeth. See, e.g., Stokes v. City of Madison, 930 F.2d 1163, 1170 (7th Cir.1991) (citing City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 770, 108 S.Ct. 2138. 2151 [1988]) (noting that city ordinance which vested officials with discretionary authority could amount to unconstitutional procedure); see also Forsyth County, Ga. 505 U.S. at 133, 112 S.Ct. at 2403 (holding that the first amendment "prohibits the vesting of such unbridled discretion in a government official" where there were no "articulated standards" of enforcement either in the subject ordinance or in the county's established practice). Because established practice demonstrates that Denver police officers, who regularly enforce state criminal and traffic laws, have interpreted the Unauthorized Display Statute so as to deprive citizens of all forms of public communication in a public forum, they have used their discretion to violate the First Amendment.

4. Conclusion
Based on the foregoing, it is therefore
ORDERED as follows:
1. Plaintiff's motion for summary judgment is GRANTED.
2. Defendants' motion for summary judgment is DENIED.
3. Plaintiff shall have judgment against defendants declaring that the Posting Ordinance (Denver, Colo.Mun.Code art. I, § 3-1 [1950]) is unconstitutional as applied to plaintiff's protesting activities on the Perry Street Overpass and cannot be enforced to prevent plaintiff from engaging in those activities.
4. Plaintiff shall have judgment against defendants declaring that the Unauthorized Display Statute (Colo.Rev.Stat. § 42-4-606[1] [1999]) is unconstitutional for vagueness and overbreadth and cannot be enforced against plaintiff.
5. Plaintiff's motions to strike affidavits submitted by certain putative experts (42, 47) are DENIED as moot.
NOTES
[1] The Posting Ordinance provides that "[i]t shall be unlawful to post, paint or attach, or directly or indirectly cause to be posted, painted or attached in any manner, any handbill, poster, advertisement or notice of any kind upon public property except by permission of the manager of public works pursuant to established rules and regulations, or on private property except by permission of the owner or authorized agent of the owner of such property." Denver, Colo., Mun.Code art. I, § 3-1.
[2] The Outdoor Advertising Act was established to "control the existing and future use of advertising devices in areas adjacent to the state highway system in order to protect and promote the health, safety, and welfare of the traveling public and the people of Colorado...." Colo.Rev.Stat. § 43-1-402.
[3] Although all parties move for summary judgment as to all of Faustin's claims, neither side addresses her right to assemble or free exercise claims in any regard. Because I am unable to rule on the relief requested without reaching these additional first amendment claims, I do not consider those claims herein.
[4] Lieutenant Fink asserts that, during his encounter with Faustin, he did not know "the specific statutory provision" on which the Denver Police Department policy concerning sign and banner displays on overpasses "was based"; but "[he] now know[s] that the specific statutory provision prohibiting banners or signage on highway overpasses is [the Unauthorized Display Statute]." (Defs.' Br., Ex. F [Fink Aff. ¶ 5].) Because this policy is allegedly based on the Unauthorized Display Regulation, my discussion addresses both the policy and the statute simultaneously.
[5] Defendants repeatedly emphasize this policy throughout their briefs before this court. Defendants state, for example, that "Denver's prohibition of expressive activities upon the freeway overpasses throughout Denver has been consistently and uniformly applied to all putative speakers regardless of the content of their message". [Lieutenant] Fink, a command officer in the Denver Police Department Traffic Operations Bureau, states:

It has been the uniform and consistent policy and practice of the Denver Police Department to prohibit all speech or expressive activities on all highway overpasses located in the City and County of Denver. Put another way, it is the Denver Police Department's policy and practice to advise all persons who wish to engage (or are engaging) in speech activities at these sites that they cannot display banners or signs while at these locations, whether or not such signs or banners are attached to protective fencing.
Put another way, it is not only [Faustin] (and her message) who is barred from engaging in expressive activities upon overpass freeways but all other speakers as well. As the affidavits of [Sergeant] Reyes and Officer [] Blea demonstrate, they  and the Denver Police Department  consistently and uniformly prohibit all speech activities on all highway overpass walkways throughout Denver, regardless of the content of the messages. ... Thus, it is the policy of both the State of Colorado and Denver to disallow banners, signs[,] or other communicative devices from highway overpass walkways because they impair or diminish highway safety." (Defs.' Br. at 9-10 [citations omitted].)